IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

04 JUL -1 PM 2: 04

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| LEWIS MORRIS, JR., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CASE NO. CV02-HGD-2402-S |
| | ) | |
| BIRMINGHAM COCA COLA | ) | |
| BOTTLING COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

ENTERED

JUL 0 1 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant [Doc. #17]. This matter is before the undersigned United States Magistrate Judge based on the consent of the parties pursuant to 28 U.S.C. § 636 (c) and Rule 73, Fed.R.Civ.P. Plaintiff, Lewis Morris, Jr., alleges that Coca Cola Bottling Company United, Inc. (United) discriminated against him on the basis of his race and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, as amended. The parties have submitted briefs and evidentiary submissions with respect to the summary judgment motion, and the matter is ready for disposition.

## FACTUAL BACKGROUND

Plaintiff, who is African-American, was hired by United on October 16, 1995, as a Swing Bulk Merchandiser. He was interviewed and hired by Walter Body, also an African-American. Three months later, Morris became a regular Bulk Merchandiser. He held this position until Body promoted him to Weekend Supervisor. In this position, Morris supervised 15 part-time employees who delivered Coke products during weekends. He held this position for 15 months.

In March 1999, Morris requested and was transferred to a Senior Salesman position. As a Senior Salesman, Morris ran delivery routes, visited stores and reset displays. Although he had no authority to hire or fire, Morris supervised approximately 15 Route Salesmen who worked in his territory and ensured that they delivered the products in a timely manner. Morris reported to an Area Manager and filled in periodically for this individual.

Body promoted Morris to the position of Advance Sales Supervisor in June 2001. In this position, Morris made sales calls to grocery and convenience stores one day in advance of the product delivery, took orders for Coke products, and rotated stock and made the store site look better, if need be. He also managed two or three Route Salesmen who delivered and merchandised the product for him. The primary responsibility of a Route Salesman is to rotate stock, set up displays, and get rid of out-of-date merchandise. [Riggins Depo. at 92-93]. Morris, however, had supervisory responsibility for the conditions of the stores assigned to him. [Body Depo. at 34-36, 42-45].

2

While Morris was Advance Sales Supervisor, Larry Riggins, United's General Sales Manager and Body's supervisor, visited several stores assigned to Morris during a three-month period. He visited once with the Area Manager, once with Morris' sales manager, and once with the Vice President. The stores visited included the Graysville Shop-a-Snak, Adamsville Smoke Shop, Graysville Jolly Food Mart, Food Fair Ensley, Food Fair Fairfield, and Fairfield Amoco Food Mart. [Riggins Depo. at 91]. Riggins testified that he found merchandising conditions at these locations to be unacceptable. He recommended that Body remove Morris from the Advance Sales Supervisor position. [*Id.*]. However, Riggins never documented these deficiencies. [*Id.* at 92]. Body testified that Riggins had spoken to him on a number of occasions about store conditions in stores assigned to Morris. Riggins advised Body he had observed such things as products that had not been rotated (out-of-date products removed and replaced) and dirty store displays. [Body Depo. at 76]. He does not recall whether Riggins recommended the removal of Morris because of these problems. [*Id.* at 77].

Sometime in August 2002, Body received word that Bo Taylor, United's Vice President for Birmingham Operations, planned to conduct a market survey of Food Fair Grocery Stores the following day. [*Id.* at 66-67]. Such surveys were performed from time to time to "look at conditions and sales and talk to customers." [*Id.* at 39]. Body testified that he typically does not receive notice of such surveys. [*Id.* at 67]. When he does, he considers it to be "a big deal" and attempts to prepare for it. [*Id.*]. As a result, Body visited

the two Food Fair stores supervised by Morris. [*Id.* at 68-69]. He observed out-of-date products, dirty display shelves, and poor merchandising at these locations. Body called Morris, shared his observations, and directed him to take care of it. [*Id.* at 38, 68-69, 83].

Body spoke to Morris about preparing for the market survey around midday. [*Id.* at 70]. Body believed that Morris could have completed these tasks in three to four hours, if he worked with someone. Body would have provided someone to help Morris had Morris indicated he needed help, but he did not do so. [*Id.* at 71-72]. Body states that he went to Morris directly because the Area Manager was out on vacation. [*Id.* at 72].

Despite Body's contact with Morris, when Taylor visited the Food Fair stores the following day, they had not been put in order as directed. [*Id.* at 41-42, 70, 72]. Upon discovering the work had not been done, Body described himself as "very disappointed." [*Id.* at 70]. The following day, Body took a couple of other people out to these stores and did the work himself. [*Id.* at 73].

Body believed that Morris' failure to carry out his instructions reflected poorly on him. He demoted Morris to Route Salesman. [Body Depo. at 38-39, 48, 72-73]. According to Body, he told his supervisor, Riggins, what he was going to do. He testified that he did not request Riggins' permission to demote Morris. [*Id.* at 40]. Riggins states that he recommended this action to Body but did not order him to take it. [Riggins Depo. at 91]. He acknowledges that he could have done so had he wished. [*Id.*]. Body asserts that he made the decision to demote Morris, and Riggins approved it. [Body Depo. at 57]. Morris

4

met with Riggins and, later, with Body and his Area Supervisor, and was advised that he was being demoted because of the condition of these stores. [Morris Depo. at 44-45].

The position to which Morris was demoted, Route Salesman, is three levels below his previous position as Advance Salesman and two above the entry-level Junior Merchandiser position. It is a non-supervisory position. [*Id.* at 11, 104]. Body testified that he demoted Morris all the way to this position because it was the only position that he had open within his department at that time. [Body Depo. at 48]. Body does not know if any other positions were open in any other departments for which Morris could have applied. However, he would have had a problem with Morris in any position that required managing people. [*Id.* at 49].

Although the company policy sets out a progressive disciplinary procedure, Morris had never been given a verbal or written warning by Riggins regarding his job performance prior to his demotion. [Body Depo. at 54-55; Riggins Depo at 101-03]. Body testified that he had received some complaints from store managers that Morris had not let them know about different promotions, but he never documented these complaints. [Body Depo. at 55].

Morris does not deny that the stores were not in the shape they were supposed to be. However, he asserts that the Food Fair stores were so large they should have been considered "bulk stores." He testified that he had been to management at least three times and told them they took up too much time to be handled properly and that they should be removed from his route. [Morris Depo. at 45-46; Body Depo. at 53]. After plaintiff's demotion, his route was

awarded to Jeff Benson, and these stores were removed from Benson's route. [Body Depo. at 53].

Prior to his demotion, Morris complained about race-related matters directly to Body on several occasions. [*Id.* at 14-17; Morris Depo. at 54]. Riggins was aware that Morris had made a written complaint about race discrimination after his demotion, but Riggins stated that prior to this he had never spoken with Morris or received a letter from him wherein he claimed to be a victim of discrimination. [Riggins Depo. at 31-35]. Morris, however, testified that he sent Riggins a letter complaining about racial discrimination shortly after he was passed over in favor of David Reilly for an Area Manager position (in March 2001). [Morris Depo. at 55-57]. Shortly thereafter, in June 2001, Morris was promoted to Advance Sales Supervisor.

The Route Manager responsible for the stores in question, Jimmy Clark, was not disciplined for the condition of the Food Fair stores at the time of the market survey. [*Id.* at 47; Riggins Depo. at 93]. Clark is also African-American. [Body Depo. at 45-46]. Clark never had made a complaint alleging discrimination. [*Id.* at 46]. The Area Manager for the stores involved in this controversy was Rod Painter. Painter, who was on vacation at the time of the survey, was not disciplined. Ray McPhaul, the Senior Sales Representative, also was not disciplined. Both are Caucasian. [Body Depo. at 47-48].

Subsequent to his demotion, Morris was again disciplined. The basis for the discipline arose on January 2 and 3, 2003, when Wiley Sanders, a Senior Salesman,

substituted for Morris as a Route Salesman. Sanders reported that he found and pulled eight to ten cases of out-of-date two-liter and half-liter bottles of Coke products. Sanders also reported that the store manager told him to consolidate and clean up the back room. [Defendant's Exhibit 3 to Morris Depo.]. Sanders again substituted for Morris later in January 2003, and he found that the out-of-date products he had pulled on January 2 and 3 had not been swapped out by Morris. [*Id.*]. He also found another 20-plus cases of three-liter products that were out-of-date. [*Id.*]. Finally, Sanders added that he also received complaints from two stores about Morris' housekeeping; consequently, he spent the week consolidating and cleaning up back rooms. [*Id.*]. Morris does not disagree with Sanders' findings. [Morris Depo. at 69-70].

Morris met with his supervisor on January 16, 2003, and was informed that 85 cases of out-of-date product had been found at Food World #72. [Defendant's Exhibit 4 to Morris Depo.]. The supervisor advised Morris that he had told him the preceding December to keep an eye on out-of-date product at this Food World and that he planned to charge him $5.00 for each out-of-date case of Coke product that had been found. Eventually, Morris was charged $400 for 80 cases. [Morris Depo. at 70, 73' Defendant's Exhibit 6 to Morris Depo.]. Morris told his supervisor that "he had just overlooked the product and understood the decision" to charge him for the product. [Defendant's Exhibit 4 to Morris Depo.]. However, he challenges the total number of cases for which he was charged, asserting that United should have only charged him for the 20 to 30 cases Wiley Sanders found rather than 80

7

cases. [*Id.*]. It is a matter of discretion regarding whether a Route Salesman is required to pay half the cost of expired products. On this occasion, the Route Salesman was not charged for any of the out-of-date product. [Riggins Depo. at 99].

Prior to his demotion, Morris applied for several Home Market Area Manager positions which were awarded to Caucasian employees. They included Area Manager positions awarded to Robert Alan Lincoln and Joe Gibson on October 1, 2000, David Reilly on March 1, 2001, and Steve Harris and Daniel Stone on August 1, 2001. Subsequent to his demotion, Morris sought promotion to a Senior Salesman position subsequently awarded to Lorenzo Harris on September 23, 2002. He also sought promotion to an Area Manager position subsequently awarded to Jeff Benson on February 3, 2003.

None of the promotions for Area Manager challenged by Morris were posted. An interested candidate was expected to know when there was an opening. [Riggins Depo. at 24-25]. There was no effort by the company to announce openings or to recruit individuals for an open position. [*Id.* at 25].

According to Riggins, the criteria for consideration for promotion to Area Manager include the ability to manage subordinates, willingness to be a team player, interpersonal skills, past performance, experience, and communications skills. [*Id.* at 20]. For an Area Manager position, the most important of these skills are past performance and the ability to manage people. [*Id.* at 21].

Riggins testified that a person who was interested in such a promotion would advise his supervisor or sales manager of his interest. Once someone had indicated an interest, Riggins testified that he would consider the person interested for any job that came open thereafter. However, no written list of interested parties ever was kept. [*Id.* at 55]. If an opening occurred later, Riggins stated he would check to see if the individual was still interested, if he considered the individual's job performance in the meantime to be good. However, job performance was not documented unless there was discipline involved. Thus, whether the employee had "done a good job" was based on his memory of the employee's performance. [*Id.* at 56-57]. In addition, Riggins has not participated in the interviewing of any candidates for Area Manager positions since Walter Body has been Sales Center Area Manager. [*Id.* at 17, 23, 57-58]. According to Riggins, Body made these decisions although he had final say over who was hired if he wished to exercise it. [*Id.* at 60-61].

Morris alleges that United denied him promotions to Area Manager and Senior Salesman because of his race. He also alleges that a retaliatory animus motivated the decision to charge him for the out-of-date products and to demote him.

## STANDARD OF REVIEW

This matter is considered by the court pursuant to the provisions of Rule 56, Fed.R.Civ.P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).  Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.  A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his or her favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). However, "[a] court need not permit a case to go to a jury when the inferences that are drawn from the evidence and upon which the non-movant relies are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Matsushita*, 475 U.S. at 592, 106 S.Ct. at 1359). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

## DISCUSSION

### I. Failure to Promote

In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence, or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen. If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent. *Wall v. Trust Co.*

11

*of Georgia*, 946 F.2d 805, 809 (11th Cir. 1991); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. To establish a *prima facie* case of discriminatory failure to promote using circumstantial evidence, Morris must show that (1) he was in a protected group; (2) he was not given the promotion; (3) he was qualified for the position; and (4) someone outside of the protected group was given the position. *Standard*, 161 F.3d at 1333.

Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading

the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

A *prima facie* case of class-wide disparate treatment may be established by statistics alone if they are sufficiently compelling. They can be relevant and important in an individual case. However, statistics alone cannot make a case of individual disparate treatment. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir. 1984); *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1143 (11th Cir. 1983).

On a class-wide basis, plaintiff notes that while 30 to 40% of defendant's workforce is black, six of the seven promotions to Area Manager positions went to white employees. Of 11 Area Managers, one is black. Thus, Morris points out management is 91% white while the labor force is 30 to 40% black.

Defendant asserts that plaintiff's reliance on this evidence is misplaced because Morris must compare the percentage of African-Americans in the job classifications from which United promotes Area Managers, *i.e.*, Senior Salesman and Advance Sales Supervisor classifications, rather than from the overall workforce. United also asserts that the statistical sample is too small to be meaningful. These assertions are well-taken. *See Mayor of City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620-21, 94 S.Ct. 1323, 1333,

39 L.Ed.2d 630 (1974); *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1388-89 (11th Cir. 1983). However, Morris still can avoid summary judgment by demonstrating that there is direct or circumstantial evidence of discrimination with regard to the promotions he was denied.

Joe Gibson

There is no direct evidence that defendant's selection of Joe Gibson over plaintiff was racially motivated. However, Morris has established a *prima facie* case with regard to the promotion of Joe Gibson through circumstantial evidence. There is no question that Morris is a member of a protected group (African-American), that he was not given the promotion, that he was qualified for the promotion, and that the promotion went to someone outside the protected group.

Nevertheless, United asserts a legitimate, non-discriminatory reason for hiring Gibson instead of Morris. United hired Gibson as the New College Manager on July 29, 1993. He held this position until he became Youth Development Manager on July 11, 1995. According to Riggins, United transferred Gibson from this position to Home Market Area Manager on October 1, 2000, as part of a reorganization. [Riggins Depo. at 36, 90; Plaintiff's Exhibit 20 to Riggins Depo; Body Depo. at 26]. In addition to his experience as New College Manager and Youth Development Manager, Gibson completed management courses taught by United. [Riggins Depo. at 90].

Body was not involved in the decision to promote Gibson because he was working in marketing at that time. Body assumes that Gibson was interviewed by Riggins. [Body Depo. at 26]. Riggins states that he promoted Gibson because "he had demonstrated an attitude of can-do teamwork, salesmanship, [and] developed relationships with customers in the education field that . . . help[ed] move our business forward at an accelerated rate." [Riggins Depo. at 89]. Gibson holds a Master's Degree. [*Id.* at 88]. Morris has two years of college. [*Id.* at 69]. Gibson's promotion was actually a lateral transfer. [*Id.* at 26].

Plaintiff asserts that he had superior qualifications. Morris points out that Gibson had only one month of experience as a Route Salesman before receiving the promotion to Area Manager [*id.* at 87-89], and his experience supervising people while doing route sales was non-existent. [*Id.*]. He also claims that the reasons stated by Riggins for selecting Gibson were all subjective and that Riggins did not know if these attributes were documented anywhere. [*Id.* at 89].

While Gibson had no experience supervising people while doing route sales, at the time of his promotion, he had worked as a manager for United since 1993 and had excelled in these managerial positions. Subjective criteria are suspect only when they are purely subjective, conclusory impressions of a litigant that are devoid of any objective facts which, if false, can be contradicted by testimony or other evidence. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 & n.25 (11th Cir. 2000) (*en banc*). Riggins did not base his decision to promote Gibson on purely subjective reasons. He also considered Gibson's performance as

New School College Manager and Youth Development Manager. Where a decision-maker's subjective reason is supported by a "clear and reasonably specific" explanation, as required by *Burdine*, *supra*, there will be objective factors that can be tested against other testimony and evidence. *Id.* According to the Eleventh Circuit,

> A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion. Continuing our example of a sales clerk or wait staff position, it might not be sufficient for a defendant employer to say it did not hire the plaintiff applicant simply because "I did not like his appearance" with no further explanation. However, if the defendant employer said, "I did not like his appearance because his hair was uncombed and he had dandruff all over his shoulders," or "because he had his nose pierced," or "because his fingernails were dirty," or "because he came to the interview wearing short pants and a T-shirt," the defendant would have articulated a "clear and reasonably specific" basis for its subjective opinion--the applicant's bad (in the employer's view) appearance. That subjective reason would therefore be a legally sufficient, legitimate, nondiscriminatory reason for not hiring the plaintiff applicant. The burden would then shift back to the plaintiff to offer sufficient evidence for a reasonable fact-finder to find that the defendant's reason was pretext for discrimination.

*Id.* at 1034.

Riggins' testimony reflects that he based his opinion that Gibson had a "can-do attitude" on his objective performance in other management positions at United. Based on this, United concluded that Gibson was the person most qualified for this position. The fact that plaintiff believes and, in fact, may have been more qualified than Gibson, does not establish pretext. The law in the Eleventh Circuit is well-established that a plaintiff's opinion

that he or she is as qualified as others is irrelevant.  It is the employer's beliefs that are important, not the employee's.  *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).  A plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, provided that the proffered reason is one that might motivate a reasonable employer.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1541-43 (11th Cir. 1997).  Federal courts

> do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high handed its decisional process, no matter how mistaken the firm's managers, the ADEA[1] does not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

*Elrod v. Sears, Roebuck, & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)).

In *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000), the Eleventh Circuit clarified the evidentiary burden a plaintiff must meet in order to prove pretext with regard to qualifications.  In a failure-to-promote case, a plaintiff must show that he or she was *substantially* more qualified than the person promoted.  The Court in *Lee* cited as an example *Deines v. Texas Dep't of Protective and Regulatory Servs.*, 164 F.3d 277, 280 (5th Cir. 1999), in which the Fifth Circuit affirmed the district court's instruction to the jury stating that "disparities in qualifications are not enough in and of themselves to demonstrate

---

[1] In the Eleventh Circuit, age discrimination suits and race discrimination suits are viewed under the same general principles.  *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (in proving an age discrimination claim, a plaintiff can establish a *prima facie* case of age discrimination using the same formulation used in Title VII discriminatory treatment cases).

discriminatory intent, unless those disparities are so apparent as to virtually jump off the page and slap you in the face." That court explained the phrase

> "jump off the page and slap [you] in the face" . . . should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.

*Id.* at 280-81.

Based on a consideration of Gibson's training, education, experience, and performance, the court cannot conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Gibson. Therefore, the court concludes that plaintiff has failed to rebut United's legitimate, non-discriminatory reason for promoting Gibson over Morris.

### Robert Alan Lincoln

Lincoln also was selected for an Area Manager position on October 1, 2000. Lincoln was hired as a Bulk Merchandiser on January 20, 1997. He was promoted to Senior Salesman on February 1, 1999. [Plaintiff's Exhibit 9 to Morris Depo.]. Morris did not become a Senior Salesman until March 15, 1999. [Plaintiff's Exhibit 1 to Morris Depo.]. The territory covered by Lincoln during most of his time as a Senior Salesman was described by Morris as "more challenging" than his own. [Morris Depo. at 78]. Lincoln had a high

school education and did not attend any of the management courses given by the company. [Riggins Depo. at 70].

As Senior Salesmen, Lincoln and Morris supervised 10 to 12 employees. [Body Depo. at 34]. According to Riggins, Lincoln was chosen because he had performed the job as Bulk Merchandiser and Senior Salesman better than Morris or any other person that was interviewed at that time. [Riggins Depo. at 70]. He also was selected based on the fact that prior to his employment with United, he had experience at a grocery store "managing a lot of people and experience in grocery stores at stocking, training stockers, et cetera, et cetera." [*Id.*]. According to Riggins, his "best judgment" is that Lincoln supervised 60 people while working at a Food Giant grocery store. Moreover, he spoke personally with Lincoln's supervisor at that store who stated that Lincoln had done a good job and that he hated to see him leave. [*Id.* at 71-72].

Morris challenges the reasons given for Lincoln's selection over Morris by claiming that Riggins' evaluation of Lincoln's better performance was subjective and undocumented. However, there is no prohibition against an employer relying on reasons that are not written down in advance of the selection process. *Chapman*, 229 F.3d at 1035 n.26. Furthermore, contrary to plaintiff's assertions, the reasons stated by Riggins are not purely subjective. Riggins testified that, among other things, he relied on Lincoln's prior managerial experience

19

in supervising 60 Food Giant employees and his former supervisor's favorable report. Thus, Riggins has articulated a "clear and reasonably specific factual basis" for his conclusions.

Upon review of all the testimony, the court cannot conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Lincoln. Therefore, the court concludes that plaintiff has failed to rebut United's legitimate, non-discriminatory reason for promoting Lincoln over Morris.

### David Reilly

Reilly was hired as a part-time employee by United in 1990. He became a full-time Route Salesman in February 1991. He moved to Bulk Route Sales on June 14, 1993, and Bulk Driver on February 21, 1994. He became an over-the-road driver on July 27, 1998, and returned to the position of Bulk Driver on March 14, 2000. He was promoted to Senior Salesman on October 16, 2000, and to Area Manager on March 1, 2001. [Plaintiff's Exhibit 17 to Morris Depo.]. Morris challenges Reilly's selection to the Area Manager position.

Walter Body interviewed Reilly, Daniel Stone, and Morris for this position. [Body Depo. at 26-27]. Body testified that he selected Reilly because Reilly impressed him in his interview and because he received excellent reports from Reilly's Area Manager, Richard King. [Body Affid. at ¶ 3]. Body reported that "King, who like me is an African-American, described Reilly as an exceptional Senior Salesman, who showed initiative, anticipated

problems, and fixed them without having to wait for King to specifically tell him what to do." [*Id.*].

Riggins testified that Reilly was promoted because he "had demonstrated a very good sales ability, communications with store managers, store owners, a willingness to be there at all hours, to do what needed to be done, [and] ability to get along with peers as well as customers." [Riggins Depo. at 86].

Morris attacks the selection of Reilly by pointing to the fact that he had only four and a half months as a Senior Salesman before his promotion to Area Manager. This was his total management experience. [*Id.* at 83]. Thus, Morris had more management experience than Reilly. [*Id.* at 85]. Reilly had a high school education and had a chargeable accident. [*Id.* at 84-85]. However, Body was unaware of Reilly's driving record. [Body Affid. at ¶ 12]. Morris had two years of college and no record of discipline. Reilly did not attend any of the United management courses before his promotion. [Riggins Depo. at 84]. Morris did.

However, Riggins testified that Morris "was late to work sometimes, that he was-- always seemed to find a way to get out earlier in the afternoon than was acceptable, that he was eager to find a reason to get somebody else to either do a task for him if it was an unexpected task, and that he left things undone from time to time." [*Id.* at 59]. Body testified that Morris had some customers who "liked him as a person, but they did feel that he did not make them aware of all the promotions and activities that were going on in his

21

territory to help them grow their business and to sell more Coke products." [Body Depo. at 75].

Morris challenges United's articulated reasons by asserting that they are undocumented and subjective. As noted above, the fact that the qualities that United found in favor of Reilly and against Morris do not have to be written down. *See Chapman*, 229 F.3d at 1035 n.26. Furthermore, not all the factors considered were purely subjective. For instance, the fact that Reilly received the recommendation of his Area Manager, Richard King, is an objective consideration. Likewise, Reilly's sales ability is a quality that can be measured by the increase in products he sold. Morris could have inquired about this when Riggins testified that it was a reason considered in awarding Reilly the promotion, but he did not do so.

The same is true with regard to some of the poor qualities attributed to Morris. For instance, Riggins testified that Morris was "eager to find a reason to get somebody else to either do a task for him if it was an unexpected task." [Riggins Depo. at 59]. Thus, Riggins and Body have articulated a "clear and reasonably specific factual basis" for their conclusions.

Upon review of all the testimony, the court cannot conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Reilly. Therefore, the court

22

concludes that plaintiff has failed to rebut United's legitimate, non-discriminatory reason for promoting Reilly over Morris.

Subsequent to the promotion of Reilly, Morris states that he wrote a letter to Riggins saying he was displeased with United's promotional practices with regard to black employees. [Morris Depo. at 51]. Riggins denies having received this letter. [Riggins Depo. at 31]. However, according to Morris, a few weeks later Riggins told Morris to come by his office. Morris met with Riggins and told him he was upset about Reilly receiving the promotion. Riggins told him it was based on Reilly's experience in route sales. [Morris Depo. at 58]. Shortly thereafter Morris was promoted to an Advance Salesman position.

<u>Steven Harris</u>

Steven Harris was hired as a Route Salesman on July 1, 1996. [Plaintiff's Exhibit 13]. His employment record reflects that he was promoted directly to Area Manager on August 1, 2001. [*Id.*]. However, both Morris and Body testified that Harris was promoted to an Advance Sales position in about April 2001 and, thus, had about four months of managerial experience at the time he was promoted to Area Manager. [Morris Depo. at 97-98; Body Depo. at 58-59]. Unlike Morris, Harris did not attend any of United's management courses. United acknowledges that plaintiff had considerably more experience in both sales and management than Harris. [Riggins at 76-77].

23

Body testified that before selecting Harris, he went out and looked at Harris' territory and interviewed his Advance Sales clients. He also interviewed Harris during which "he gave me ideals, points that he felt were important, issues that would help to move the department further along in trying to achieve sales goals." [Body Depo. at 58]. He also looked at his "merchandising skills," "thought about his managerial skills" and "thought about his dedication to the company and to his customers." [Id.]. According to Body, Harris' customers told him that Harris was very aggressive in letting them know about promotions and was very aggressive about "looking for opportunities to grow their business, grow their Coca-Cola sales." [Id. at 74]. These customers told Body that Harris was "very interested in them, and they had an overall good feeling about him as a manager." [Id. at 74-75].

Body's decision to promote Harris because he was impressed with his "ideals," because he had "issues that would move the department further along to achieve sales goals" and other similar reasons, is a decision based, at least in part, on clearly subjective reasons. The use of subjective standards that are incapable of objective evaluation can be circumstantial evidence of discrimination. *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 643-33 (11th Cir. 1998). However, the facts that he helped them "grow their Coca-Cola sales" and that many of his customers spoke highly of him are objective reasons for promoting him. [*See* Body Affid. at ¶ 4]. The subjective nature of some of the stated

24

reasons, standing alone, is insufficient to establish discrimination. However, Morris has offered other evidence of discrimination in addition to this.

After Harris received this promotion, Morris states that he went to Body's office and told him that Harris' promotion over him was discrimination and that he was displeased about the situation. [Morris Depo. at 60]. Morris then left and went to Wal-Mart to perform his sales duties. Morris avers that shortly after his arrival at Wal-Mart, Body came in, according to Morris, and stated that "you are exactly right, it was discrimination." [*Id.* at 60-61]. Morris also stated that Body had told him that Riggins "is the final say-so" and that "all he [Body] can do is interview." [*Id.* at 61]. Contrary to Body's testimony that Riggins never vetoed his selection for a promotion [Body Depo. at 23], Morris testified that Body told him that Riggins made the final decision and stated, "I'm sorry. I apologize." [Morris Depo. at 63]. Body testified that he does not remember if he made such statements. [Body Depo. at 15-16].

Unlike the other promotions already discussed, plaintiff alleges that this is direct evidence of discriminatory intent in his failure to obtain this promotion. Although United contends that Body made the decision to promote Harris and that Riggins never overruled a Body selection for promotion, Morris has provided testimony which, if believed, reflects an admission by Body that this decision was, in fact, made by Riggins and that Riggins' selection of Harris was racially discriminatory.

To qualify as direct evidence of discrimination, the evidence must indicate that the complained of employment decision was motivated by the decision-maker's discriminatory bias and only the most blatant remarks, whose intent could be nothing other than to discriminate, will constitute direct evidence of discrimination. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999).

Even if this statement is not sufficient to qualify as direct evidence of discrimination, it may be admissible otherwise to rebut defendant's stated legitimate, non-discriminatory reason for not promoting Morris. According to the Eleventh Circuit,

> Under the Federal Rules of Evidence, "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). As a general rule, "[h]earsay is not admissible except as provided by these rules. . . ." Fed.R.Evid. 802. Excepted from the definition of hearsay, however, is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," which is deemed an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(D). Thus, statements made by a supervisory official who plays some role in the decision making process are generally admissible. *See, e.g., Miles v. M.N.C. Corp.*, 750 F.2d 867, 873-75 (11th Cir. 1985). Moreover, such statements can constitute direct evidence of discrimination. Under this circuit's precedent, direct evidence of discrimination is competent evidence which, if believed, would prove the existence of a fact at issue without inference or presumption. *See Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).
>
> The statements need not constitute direct evidence of discrimination, however, to be admissible. [Plaintiff] relies on

26

several decisions which approve the admission of supervisors' statements regarding possible age bias of others within a company. The Seventh Circuit Court of Appeals has held that statements by the plaintiff's supervisor about "the attitude, intentions and/or policy of the higher-ups" in management were properly admitted into evidence. *See Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 (7th Cir. 1990). Crucial to that decision, however, was the court's conclusion that the statements were a direct warning by the plaintiff's supervisor, himself a member of management, and that they were not simply a repetition of what others in management had told him. *Id.* Thus, the statements posed no "double hearsay" problem. *Id.* Similarly, the Third Circuit Court of Appeals has held that an employee may testify about statements made by his supervisor regarding company policy toward older employees. According to that court, "[w]here a supervisor is authorized to speak with subordinates about the employer's employment practices, a subordinate's account of an explanation of the supervisor's understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer." *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1216 (3d Cir. 1995). The court found that there was no double hearsay problem because the supervisor's explanation, if offered in person by the supervisor, would not be subject to a hearsay objection. *Id.* In each of these cases, the supervisor's statements to their subordinates were found to have been made within the ordinary scope of their duties. Therefore, they constituted an admission by a party opponent which was not excludable as hearsay.

*Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456 (11th Cir. 1997). *See also, Zipf v. American Tel. and Tel. Co.*, 799 F.2d 889, 895 (3d Cir. 1986) (higher-up's statement to person designated to terminate plaintiff admissible as probative of decision-maker's true intentions).

27

Body's alleged statement to Morris that the decision to promote Harris over plaintiff was discrimination is not direct evidence of discrimination. Direct evidence would be evidence such as a statement by Riggins that he did not promote Morris because he is black. Here, we simply have what appears to be Body's opinion that the failure to promote Morris was based on discrimination. However, because Body played a role in the decision-making process and the statement is one which reflects the employer's policy or intent to discriminate or is an explanation to plaintiff of the employer's policy or position on the matter that was made within the scope of Body's authority, it is admissible evidence of discrimination. *Zaben, supra.*

This evidence is considered by the undersigned as evidence submitted in rebuttal to defendant's allegedly non-discriminatory reason for not promoting Morris. As noted above, with regard to pretext, the "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod*, 939 F.2d at 1470. Although the differences in the experience and qualifications of Harris and Morris are striking, they are not, standing alone, sufficient to rebut defendant's stated non-discriminatory basis for promoting Harris over Morris. *But see, Taylor v. Runyon*, 175 F.3d 861, 867-68 (11th Cir. 1999) (vastly greater experience establishes evidence of pretext sufficient to avoid judgment as a matter of law); *Lee, supra*; *Deines, supra.*

However, in addition, the court must consider the total lack of standards for promotions, the failure of United to document any performance evaluations, and the

28

subjective nature of a number of the stated reasons for its actions in this particular promotion.

The use of subjective standards that are incapable of objective evaluation and the failure to

promulgate hiring and promotion policies can be circumstantial evidence of discrimination.

*See Carter v. Three Springs Residential Treatment*, 132 F.3d at 643-33; *Watson v. National*

*Linen Service*, 686 F.2d 877, 881 (11th Cir. 1982).  When considered together with the

evidence of Body's statement to Morris that Riggins made the final decision regarding the

selection of Harris and that his denial of the promotion was racially discriminatory, there is,

in the court's judgment, sufficient evidence of pretext to create an issue of fact for a jury.


### Daniel Stone

United hired Daniel Stone as a part-time Route Helper on August 5, 1996. [Plaintiff's

Exhibit 14].  He was promoted to Route Salesman on September 8, 1997. He held this

position until April 24, 2000, when he was promoted to Senior Salesman.  Stone was

promoted to Area Manager on August 1, 2001.  [*Id.*].

Body testified that he selected Stone because of "his sales skills, his working with

customers, his working with people." [Body Depo. at 60].  As part of his decision, Body

spoke to Stone's customers that he served while a Senior Salesman.  They described him as

conscientious and as someone who cared about their business and how Coke products could

positively impact their business. The customers also reported that they routinely called Stone

when the Area Manager was unavailable and that he always addressed their inquiries to their

satisfaction. Body stated that based on his interview of Stone and Stone's customers, as well as his overall observations of Stone's and Morris' work performances, he felt that Stone was better qualified than Morris for the Area Manager position. [*Id.*; Body Affid. at ¶ 5].

Plaintiff takes issue with the promotion of Stone because he was 26 years old and had only 15 months of management experience at the time of his promotion. [Riggins at 79]. Plaintiff had more time with the company, more time as a Route Salesman, and more education than Stone. [*Id.* at 81, 82]. Stone had a chargeable accident while a Route Salesman. [*Id.* at 82].

Body's reasons for promoting Stone over Morris are capable of objective evaluation. He testified that it was based, in part, on his overall evaluation of the work performance of the two men. For instance, Body testified that Morris' customers felt like he did not make them aware of all the promotions and activities that were going on in his territory to help them grow their businesses and to sell more Coke products. [Body Depo. at 75]. By contrast, Stone's customers praised his performance. [Body Affid. at ¶ 5]. Body also had had conversations with Riggins regarding shortcomings in Morris' performance. [Body Depo. at 76]. Riggins also articulated Morris' attributes and shortcomings.

Based on a consideration of Stone's training, education, experience, and performance as articulated by Body and Riggins, the court cannot conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Stone. Therefore, the court concludes

that plaintiff has failed to rebut United's legitimate, non-discriminatory reason for promoting Stone over Morris.

### Jeffery Benson

Jeffery Benson was hired by United as a Route Salesman on January 13, 2000. On August 6, 2001, he was promoted to Senior Salesman. On August 6, 2002, he was promoted to Advance Sales Supervisor. He was promoted to Area Manager on February 3, 2003.

According to Body, after Morris' demotion, Morris continued to have performance deficiencies which led the company to charge him $400 in January 2003 for leaving out-of-date products at a grocery store. "In light of his demotion and the continued performance issues," Body "did not believe that Morris had demonstrated that he could handle the Area Manager position." [Body Affid. at ¶ 8]. In his affidavit, Body states that Benson replaced Morris as Advance Sales Supervisor after Morris was demoted from the position in August 2002, and that while in that position, Benson's performance was outstanding and he demonstrated to Body that he would do well as an Area Manager. [*Id.*].

Plaintiff asserts that he should have been chosen for this position because he had superior qualifications by having more years of experience in the industry and in route sales. He also claims to have more supervisory experience in the industry. He does not address the reasons stated by Body for his non-selection. *See Chapman*, 229 F.3d at 1024-25 (where a plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact

31

regarding whether each of the defendant's articulated reasons is pretextual, the defendant is entitled to summary judgment on the plaintiff's claim).

The court cannot conclude that no reasonable person, in the exercise of impartial judgment, could have chosen Benson. In a failure to promote case, a plaintiff must show that he or she was *substantially* more qualified than the person promoted. *Lee*, 226 F.3d at 1254. Morris has failed to do so. Morris' claim that he is the better qualified candidate is insufficient to show that the reason stated by Body for Morris' promotion was pretextual. Therefore, this claim is without merit.

## Lorenzo Harris

Lorenzo Harris was promoted to Senior Salesman on September 23, 2002. This promotion occurred a month after Body demoted Morris from the Advance Sales Supervisor position. [Body Affid. at ¶ 7]. Based on the conduct that had led up to Morris' demotion, Body did not think that Morris should be in a Senior Salesman position because it would require him to supervise employees. [*Id.*]. The selected employee, Lorenzo Harris, is an African-American. [*Id.*]. Therefore, plaintiff cannot establish a *prima facie* case of discrimination in promotion with regard to Lorenzo Harris.

32

## II. Retaliation

Morris also contends that United retaliated against him for complaining about race discrimination. He complains about two particular instances of alleged retaliation. First, he maintains that his demotion from the position of Advance Sales Supervisor to Route Sales in August 2002 was an act of retaliation. [Morris Depo. at 50, 110-111]. Second, he alleges that United's decision to charge him $400 in January 2003 for leaving expired products on some grocery store shelves in his territory was also retaliation. [*Id.* at 69-75].

"To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). It is uncontested that there is evidence to establish the first two elements of this claim. The causal connection is open to question. However, United, for purposes of this motion only, assumes that Morris can establish a *prima facie* case of discrimination, but it asserts that he cannot show that United's articulated reasons for the actions he challenges are pretextual. [Doc. #20, Defendant's Brief in Support of Summary Judgment, at 23]. *See Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." (citation and internal marks omitted)).

33

Demotion

Walter Body testified that he demoted Morris because he ignored Body's direct order. As noted above, after learning that Bo Taylor, Vice President of Birmingham Operations, planned to inspect Food Fair Stores the next day, Body visited the stores in his territory. At the two stores assigned to Morris, he observed expired products on the shelves, dirty shelves, and poor merchandising. Body called Morris sometime in the early afternoon, informed him of the upcoming inspection, and gave Morris specific instructions concerning what he expected Morris to do before the next day's inspection. According to Body, this work could have been accomplished in three to four hours. However, because these stores did not close until 8:30 or 9:00 p.m., Morris had even more time to get this work done, if needed.

Despite Body's specific instructions, Morris failed to prepare the two stores for the inspection. After Taylor visited the stores and reported their condition to Body, Body personally visited the stores again and verified that the work had not been done. Subsequently, he took another employee to these locations and did the work himself. Body felt that Morris' conduct reflected poorly on Body and it disappointed him. No other employee ever had engaged in a similar act of insubordination. [Body Depo. at 74].

In his response, Morris spends a considerable amount of time complaining that the stores that were the subject of his demotion were too big for him to keep in shape and that others who also had responsibility for these stores were not also punished.

34

The testimony reflects that, although Riggins, at some point, recommended that Morris be removed from his position as Advance Sales Supervisor, he did not order Body to do so. This decision was made by Body. Body testified that he did so based on Morris' failure to carry out his specific instructions to clean up these two stores. Morris does not deny that he received this directive or that the work was not done. Body also demoted Morris to Route Salesman, a position three levels below his previous position, because that was the only job available in his department; Morris does not dispute this assertion. Morris claims that other employees with some responsibility for the conditions in these stores were not disciplined, but none of the other employees were given a direct order which they failed to carry out.

Morris appears to maintain that Body did receive a direct order to clean up these stores because when asked, "Didn't Mr. Taylor expect you to have these stores up and running and in good shape?", he responds "Yes." [Body Depo. at 81]. However, this expectation is a general one and not a specific instruction related to these particular stores. Furthermore, Body and Morris are not similarly situated and, therefore, Body is not a valid comparator.

However, United demoted other similarly-situated employees in the same manner as Morris. On February 6, 1995, United demoted Chris Richardson from Advance Sales Supervisor to Route Salesman, the same degree of demotion as for plaintiff. [Riggins Depo. at 111; Plaintiff's Exhibit 25]. Richardson was demoted for substandard merchandising and for causing delays in United's shipping operations. [Riggins Depo. at 111]. Body also

35

demoted Mike Helms from Advance Sales Supervisor to Bulk Merchandiser. Both of these individuals are Caucasian. [Body Affid. at ¶ 11]. Because Morris cannot show that he was treated differently than other similarly situated Caucasian employees, this retaliation claim fails.

Monetary Penalty

Morris also challenges United's decision to charge him $400 in January 2003 for 80 out-of-date cases of Coke products allegedly found at one of the Food World grocery stores in Morris' territory.

Wiley Sanders, a Senior Salesman who worked Morris' route on two different occasions in January 2003, reported that he found over 30 cases of out-of-date products on the store shelves. [Defendant's Exhibit 3 to Morris Depo.]. Sanders pulled the out-of-date product from the shelves but returned several days later to find that it had not been swapped out. [*Id.*]. Sanders also reported that he received complaints from managers at two grocery stores about Morris' housekeeping and that he spent the week of January 6, 2003, "consolidating and cleaning up back rooms." [*Id.*].

On January 16, 2003, Morris was counseled about this problem by his supervisor. In his write-up of the counseling, the supervisor states that there were 85 cases of out-of-date product found in Food World Store No. 72. The supervisor stated that he had told Morris in December to keep an eye on some "close dated product in this Food World." [Defendant's Exhibit 4 to Morris Depo.]. He notes that Morris failed to do so. [*Id.*]. He further stated that on January 2 and 3, Wiley Sanders ran Morris' route and found 8 to10 cases of out-of-date

36

product and found the 85 cases when he ran it again the week of January 6 through 10. [*Id.*]. The supervisor wrote that he informed Morris that he would be charged $5 per case and that Morris "explained to me that he just overlooked the product and understood" the decision to charge him. [*Id.*]. He was subsequently charged for 80 cases at a cost of $5 per case. According to Body, he has imposed a similar charge on James Phillips and Terry Love, Advance Sales Supervisors, and also on Mark Martin, a Bulk Merchandiser. [Body Affid. at ¶ 9].

Morris admits that he left out-of-date product in the store. He denies that it was 80 cases, asserting that the correct number was 30. [Morris Depo. at 70-71, 74]. He also complains that only he was charged for this product and that the Advance Salesman was not made to split this expense. However, testimony reflects that the decision on who to charge in such incidents is a discretionary decision. [Riggins Depo. at 99]. Further, plaintiff does not address the fact that similar charges were imposed on Phillips, Love, and Martin. Where a plaintiff has fails to show that he was treated differently from similarly situated individuals and no other evidence of retaliation has been presented, the plaintiff has failed to establish a *prima facie* case of discrimination. *Holifield*, 115 F.3d at 1562. Although Morris alleges that he was charged for 50 more cases than he was responsible for, the evidence reflects that at some point 85 cases of out-of-date product were discovered at Food World Store No. 72. The number of cases for which Morris was charged was determined by his direct supervisor, not Body or Riggins. [See Defendant's Exhibit 4 to Morris Depo.]. There is no evidence

37

that this supervisor had any knowledge whatsoever of Morris' prior complaints of race discrimination.  Therefore, this is not evidence of retaliation.

In addition, to be actionable, the discrimination must constitute an adverse employment action.

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way.  Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment.  We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001).  Being charged for 80 cases instead of 30 cases resulted in a cost of an extra $250 to Morris.  While not an insignificant sum, it is hardly a "serious and material change" in the terms, conditions, or privileges of his employment.

Based on the reasons set out above, plaintiff has failed to establish a viable claim of retaliation.

38

## CONCLUSION

Based on the foregoing, the court finds that defendant's Motion for Summary Judgment with regard to the promotion of Steve Harris over plaintiff is due to be denied. In all other respects, the Motion for Summary Judgment is due to be granted. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ___30th___ day of June, 2004.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE